# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 10, 2001

## STATE OF TENNESSEE v. WYGENZO COBURN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 99-07634     W. Fred Axley, Judge**

---

**No. W2000-01550-CCA-R3-CD - Filed August 29, 2001**

---

The defendant was convicted of voluntary manslaughter, a Class C felony, and sentenced as a Range I, standard offender to four years, six months in the county workhouse. In this appeal as of right, he raises the following issues: (1) whether the evidence was sufficient to support his conviction; (2) whether the trial court erred in failing to include "moral certainty" language in its reasonable doubt instruction to the jury; and (3) whether the trial court erred in its application of enhancement factor (10). Based upon a careful review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Marvin E. Ballin, Memphis, Tennessee, for the appellant, Wygenzo Coburn.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General; and Charles W. Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant, Wygenzo Coburn, was charged with one count of second degree murder for the shooting death of John Wesley James, Jr. The proof at trial showed that the defendant shot the victim in the head in the early morning hours of October 7, 1998, causing the victim to suffer severe brain injury leading to a comatose state. The victim died in the hospital approximately two months later as a result of this gunshot wound.

Jerome Jones, an eyewitness to the shooting, testified that the victim was his cousin, and that they had lived together in the two-bedroom Memphis apartment in which the victim was shot. At about 1:15 a.m. on October 7, 1998, he and the victim were each in their own rooms when the

defendant's mother, Joyce Turner, a neighbor, came to the apartment searching for cigarette papers and a condom. Jones let her in. He said that she was quite loud, and that it was obvious that she had been drinking. When the victim requested that she be quiet because his two children were trying to sleep, Turner asked him if he had a condom. According to Jones, the victim told Turner that he did not have any, and then added, "You out here selling your ass, you buy your own damn condoms." Turner responded by telling the victim to "kiss her ass." Jones said that Turner kept repeating, over and over, "Kiss my ass, kiss my ass." An argument ensued, which led to the victim retrieving his roofing hammer[1] from the kitchen, chasing Turner out of the apartment, and locking the apartment door. From outside the locked door, Turner continued "hollering" through the door for the victim to "kiss her ass." The victim struck the locked door once with his hammer, and then went back into his bedroom and closed the door.

After going back into his own bedroom, Jones could hear Turner knocking on the door of her sister's nearby apartment, "trying to get in." About three or four minutes later, he heard her knocking on the back door of his apartment. He opened the door, and she came back inside. As she did so, Jones noticed the defendant standing outside on the sidewalk with a nine-millimeter pistol in his hand. Jones said that he told the defendant that he was not going to let anyone hit his mother with the hammer. At that time, the defendant appeared to be "cool." Jones said that "everybody knew everybody," and that he, the victim, and Turner were "all friends."

In the meantime, however, Jones could hear Turner back inside the apartment telling the victim to "kiss her ass, kiss her ass, kiss her ass again." Turner then came running back out of the apartment, followed by the victim, who once again had his roofing hammer. Jones said that as the victim chased Turner out of the apartment, he slipped and fell in the mud in front of the defendant. The defendant pointed his gun at the victim and told him not to hit his mother with the hammer. The victim answered that he was not going to hit the defendant's mother, and walked back inside the apartment, carrying the hammer down at his side. Turner, Jones said, was "just standing there, just talking crazy," continuing to tell the victim to "kiss her ass," and saying, "That mother fucker going to hit me with that hammer."

Jones testified that the defendant followed the victim to the apartment door, standing on the porch and pointing his gun where the victim was standing inside the kitchen, as he once again told him not to hit his mother with the hammer. The victim told the defendant to tell his mother to quit coming into his apartment telling him to "kiss her ass." According to Jones's testimony, at about that point, Turner said, "If you don't shoot him, I will, I will, I will, I will." The victim then said to the defendant, "Okay, man, I'm through with it. I'll stay–I'm staying here." Next, the defendant backed up about two steps, and the gun went off. The bullet went through the wall beside the open doorway, striking the victim in the head as he stood inside the kitchen.

---

[1]At other points during his testimony, Jones referred to this tool as a "hatchet." Photographs in the record reveal a short-handled instrument containing a wedge-shaped hammer-type head at one end, with a hatchet, instead of a claw, at the other end.

Jones said that the victim had not made any threatening gestures towards either the defendant or his mother after falling in the mud, that he had never attempted to hit Turner with the hammer, and that his last words before the defendant fired the gun were that he was "through with it." Jones said that he had not been aware, at first, that the victim had been shot, and that he did not believe that the defendant had realized it either. He later admitted, however, that he could not have known what was in the defendant's mind when he fired the shot. He said that the defendant had told him several days after the shooting that he had not meant for the gun to fire. Jones testified that the defendant and his mother had both been drinking earlier in the afternoon and evening before the shooting, but that neither he nor the victim had had anything to drink.[2]

Officer Jeffrey W. Jordan of the Memphis Police Department was the first police officer to respond to the scene of the shooting. He testified that when he arrived at the scene he saw the victim, with an apparent bullet wound to the side of his head, lying in a pool of blood just inside the doorway of the apartment. Two small children, whose ages he estimated at between two and three, were standing beside the victim.

Dr. O'Brian Cleary Smith, the Shelby County Medical Examiner, who performed the autopsy on the victim's body, stated that the victim died as a result of a gunshot wound to his head which resulted in severe brain injury, causing a comatose state. The severe brain injury and comatose state led to the eventual development of bronchial pneumonia that ultimately caused his death.

The twenty-five-year-old defendant testified that he was at his aunt's apartment, next door to the victim's apartment, at about 1:00 a.m. on October 7, 1998, when his mother came in drunk. After an argument about her being out so late, he told her to go home to his little sister, and she left. He next saw her when she "came from next door banging on [his] aunt's door real hard like somebody was there." When he opened the door, she told him that someone was trying to hit her in the head with a hammer. He immediately grabbed his gun and accompanied her out of the apartment. As he was trying to find out who was after her, Jones came out of his apartment. His mother, he said, was "in one ear yapping," while Jones was in the other ear saying that it was "bull shit," so that he was unable to understand what either one was saying. About two minutes later, the door to Jones's apartment came "flying open," and the victim "came storming out the door with the hatchet," going "straight toward" the defendant's mother.

The defendant said that the victim slipped and fell into him, swinging at his arm with the hatchet as he fell. As the defendant helped him up, the victim drew back again with his hatchet aimed at the defendant's mother. The defendant brought his gun out and stepped back, telling the victim that if he hit his mother with the hatchet, he would shoot him. The victim said to his mother, "Bitch, I'm going to kill you, whore, I'm going to fuck you up," and backed into the dark house, where the defendant could not see him. At about that time, the defendant said, his mother tapped him on the shoulder, causing him to jump and the gun to go off. The defendant testified that he was

[2]The parties stipulated that the victim was drug- and alcohol-free when he was admitted to the hospital for treatment of his gunshot wound.

not at first aware that the victim had been shot. He said that after the gun went off he turned and started to walk back toward his aunt's house. As he was walking away, he heard the victim coming toward the door. The victim dropped his hatchet, grabbed his head, and fell.

The defendant testified that he had been afraid for his mother's life. He said that he had only intended to scare the victim into leaving his mother alone, and had never intended to shoot him. He claimed that the shooting had been an accident. He admitted, however, that he had fled the area after the shooting, hiding out on "the streets and alleys and stuff," before turning himself in to the police on October 13.

The State presented the rebuttal testimony of Joyce Turner, who denied that she had gone to get her son from her sister's apartment. She said that the defendant had been outside on the sidewalk when the victim chased her out of Jones's apartment, swinging the hatchet at her. The defendant had pulled her to the side, and the victim had run into the defendant. After falling into the defendant's arms, the victim had gone back into the apartment, where she could see him standing behind the door facing. She had been talking to the defendant when the gun fired. Turner said that she had been afraid for her life because the victim was swinging the hatchet at her. She thought that if the defendant had not pulled her out of the way, the victim would have hit her, and believed that her son had been trying to protect her when he shot the victim. She admitted, however, that in her original statement to police she had never mentioned the victim's having swung the hatchet at her.

The jury found the defendant guilty of voluntary manslaughter, and the trial court sentenced him as a standard, Range I offender to four years, six months in the county workhouse. Following the denial of his motion for a new trial, the defendant filed a timely appeal to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first contends that the evidence was insufficient to establish beyond a reasonable doubt that he committed the offense of voluntary manslaughter. Specifically, he argues that the State failed to establish that he committed a knowing killing of the victim. He asserts that the evidence shows only that he fired a weapon, "not that he knew that the result of firing the weapon would be the killing of the [victim]."

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions

involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Voluntary manslaughter is defined in Tennessee Code Annotated Section 39-13-211(a) as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(18) (1997). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Tenn. Code Ann. § 39-11-106(20) (1997).

Viewed in the light most favorable to the State, the evidence in this case showed the following: After witnessing the victim chase his mother from the apartment with a roofing hammer, the defendant pointed a loaded nine-millimeter handgun at the victim and threatened to shoot him. Carrying the hammer in a nonthreatening position down at his side, the victim retreated to the kitchen of his apartment, with the defendant following to the porch and pointing his gun in the victim's direction as he continued to threaten him. The defendant's mother urged the defendant to shoot the victim even though the victim said that he was finished arguing with the defendant's mother. The defendant then fired his weapon through the wall of the apartment beside the open doorway, striking the victim, who was standing behind the door frame, in the head and ultimately causing his death. From this evidence, a rational trier of fact could have concluded that the defendant shot the victim either intentionally, *i.e.*, with the conscious desire to cause the result, or knowingly, *i.e.*, with the awareness that his conduct was reasonably certain to cause the result. By convicting him of voluntary manslaughter, the jury obviously concluded that the defendant was provoked by the victim's treatment of his mother, but that his actions went beyond those necessary to defend his mother. The evidence at trial was more than sufficient to support the defendant's conviction of voluntary manslaughter. This issue, therefore, is without merit.

## II. Reasonable Doubt Instruction

The defendant next contends that the trial court erred in its reasonable doubt instruction to the jury. In particular, he argues that the court's failure to issue the standard pattern jury instruction containing "moral certainty" language lowered the standard of proof by which the State had to prove him guilty of the offense, depriving him of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The State responds by citing a number of this court's recent opinions that hold that Tennessee Pattern Jury Instruction 2.03(a), the reasonable

doubt instruction utilized by the trial court in this case, is not unconstitutionally deficient for its failure to include "moral certainty" language.

The defendant asked that the trial court instruct the jury on reasonable doubt by use of T.P.I.-Crim. 2.03, which contains language that the jury must find the defendant guilty to a moral certainty. The trial court refused the request, opting instead to use T.P.I.-Crim. 2.03(a), which provides as follows:

> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case.
>
> It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge.
>
> A reasonable doubt is just that–a doubt that is reasonable after an examination of all the facts of this case.
>
> If you find that the state has not proven every element of the offense beyond a reasonable doubt, then you should find the defendant not guilty.

The defendant complains that this instruction fails to adequately define the meaning of reasonable doubt in the context of a criminal trial, allowing the jury to convict a defendant on less proof than that required by the "moral certainty" language of T.P.I.-Crim. 2.03.

We have previously rejected similar challenges to the use of T.P.I.-Crim. 2.03(a). See, e.g., State v. Ronald D. Correll, No. 03C01-9801-CC-00318, 1999 WL 812454, at *8 (Tenn. Crim. App. Oct. 8, 1999), perm. to appeal denied (Tenn. April 24, 2000) (holding that T.P.I.-Crim. 2.03(a) is consistent with principles of due process); State v. Tony Fason, No. 02C01-9711-CR-00431, 1999 WL 588150, at *4 (Tenn. Crim. App. Aug. 6, 1999), perm. to appeal denied (Tenn. Feb. 7, 2000) ("'Moral certainty' is not required language in a jury instruction."); State v. Roscoe L. Graham, No. 02C01-9507-CR-00189, 1999 WL 225853, at *12 (Tenn. Crim. App. April 20, 1999) (holding that reasonable doubt instruction omitting language of moral certainty is adequate). In State v. Melvin Edward Henning, No. 02CO1-9703-CC-00126, 1997 WL 661455, at *9 (Tenn. Crim. App. Oct. 24, 1997) (footnote and citations omitted), we rejected a challenge that T.P.I. Crim. 2.03 (a) was constitutionally deficient because it did not contain "moral certainty" language:

> Tennessee Pattern Instruction 2.03(a) tracks virtually identical language of pattern reasonable doubt instructions approved by a majority of the federal circuits. Moreover, the questioned language "based upon reason and common sense" and "absolute certainty is not

required" has repeatedly been upheld as passing constitutional muster.

> We do not find that the instruction taken separately renders the reasonable doubt instruction constitutionally deficient. Additionally, considering this language in the context of the full charge, we find no reasonable likelihood that the jury understood the instruction to permit conviction after anything but a process of careful deliberation or upon less than proof beyond a reasonable doubt. This issue is without merit.

We conclude that the trial court's use of T.P.I.-Crim. 2.03(a) in this case adequately conveyed the meaning of reasonable doubt to the jury, and did not lower the standard of proof by which the State had to prove the defendant guilty of the elements of the offense. This issue, therefore, is without merit.

### III. Enhancement Factor (10)

Finally, the defendant contends that the trial court erred in applying enhancement factor (10) to enhance his sentence. Tenn. Code Ann. § 40-35-114(10). He argues that the trial court's use of this enhancement factor was improper because a high risk to human life was an essential element of his crime of voluntary manslaughter. The State points out that enhancement factor (10) has been found to be appropriate in cases of voluntary manslaughter when individuals other than the victim were placed at risk by the defendant's actions, and asserts that it was appropriately applied in this case based on evidence that other individuals, including Jerome Jones and the defendant's mother, Joyce Turner, were present when the defendant brandished his loaded weapon and fired it into the apartment.

The defendant, as the party challenging the sentence imposed by the trial court, has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." Ashby, 823 S.W.2d at 169. The weight to be afforded an enhancement or a mitigating factor is left to the trial court's discretion as long as the trial court complies with the purposes and principles of the 1989 Sentencing Act, and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210 (1997), Sentencing Commission Cmts.; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In this case, the trial court found two enhancement factors applicable: (1) the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission

of the offense; and (2) the defendant had no hesitation about committing a crime when the risk to human life was high. Tenn Code Ann. § 40-35-114(9) and (10) (1997). The court found no applicable mitigating factors. As a Range I, standard offender convicted of a Class C felony, the defendant was subject to a sentence ranging from three to six years. See Tenn. Code Ann. § 40-35-112(a)(3) (1997). Based on the presence of the enhancement factors, and the absence of any mitigating factors, the trial court enhanced the defendant's sentence from the minimum of three years to four years, six months, and ordered that he serve his time in the county workhouse.

The defendant challenges only the application of enhancement factor (10), arguing that it is inherent in the offense of voluntary manslaughter. The applicability of a particular enhancement factor must be determined on a case-by-case basis. State v. Lavender, 967 S.W.2d 803, 807 (Tenn. 1998). If the same facts that establish an element of the offense charged are also used to establish the enhancement factor, then the enhancement factor may not be used to increase punishment. Id. (citing State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)). However, although enhancement factor (10), "[t]he defendant had no hesitation about committing a crime when the risk to human life was high," Tenn. Code Ann. § 40-35-114(10) (1997), is inherent in every homicide case with respect to the victim, the trial court may appropriately consider this factor when the evidence shows that the defendant's actions placed the lives of individuals other than the victim at risk. See State v. Kelley, 34 S.W.3d 471, 480 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2000); see also State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995); Jones, 883 S.W.2d at 601. The record in this case reflects that the trial court applied enhancement factor (10) based on the presence of persons other than the victim in the area when the defendant fired his gun through the wall of the apartment. The evidence at trial showing that the victim's two children, as well as Jones and Turner, were present in the immediate vicinity and thus subject to risk by the defendant's actions in firing his gun into the apartment, supports the trial court's application of this factor. This issue is without merit.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

 

 

_____
ALAN E. GLENN, JUDGE